# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1985-20

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LUAIE ALHARDAN,

     Defendant-Appellant.

_____

> Submitted December 20, 2023 – Decided December 27, 2024
>
> Before Judges Gummer and Walcott-Henderson.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 19-10-1105.
>
> Ron Bar-Nadav, attorney for appellant.
>
> Matthew J. Platkin, Attorney General, attorney for respondent (Lila Bagwell Leonard, Deputy Attorney General, of counsel and on the brief).

    The opinion of the court was delivered by

GUMMER, J.A.D.

Defendant Luaie Alhardan pleaded guilty to two charges of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), admitting to intentionally physically abusing and seriously injuring his then eleven-year-old son, Johnny,[1] on multiple occasions. He was sentenced to two consecutive five-year terms of imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant appeals those sentences, arguing:

> POINT ONE:
>
> THE COURT ABUSED ITS DISCRETION BY ALLOWING THE PROSECUTOR TO PRESENT HIGHLY INFLAMMATORY AND PREJUDICIAL SUBMISSIONS/EVIDENCE FOR CONSIDERATION PRIOR TO DECIDING TO SENTENCE APPELLANT TO (A) CONSECUTIVE TERM(S) OF IMPRISONMENT.
>
> POINT TWO:
>
> BASED ON THE IMPROPER SUBMISSIONS/EVIDENCE THAT WAS PERMITTED TO BE CONSIDERED AGAINST THE APPELLANT, THIS RESULTED IN THE MISAPPLICATION OF THE [STATE V.] YARBOUGH[, 100 N.J. 627 (1985), MODIFIED BY STATE V. TORRES, 246 N.J. 246 (2021)] STANDARD IN THIS CASE.

---

[1] We use a pseudonym to protect the privacy of the child-victim pursuant to Rule 1:38-3(c)(9).

A-1985-20

Having considered the record and applicable legal principles, we perceive no abuse of discretion or misapplication of the law by the trial court and, accordingly, affirm.

## I.

In 2019, a grand jury returned an indictment charging defendant with: two counts of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (counts one and seven); five counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2) (counts two, three, eight, eleven, and twelve); one count of third-degree witness tampering, N.J.S.A. 2C:28-5(a)(1) (count four); one count of third-degree hindering one's own apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1) (count five); one count of fourth-degree obstructing the administration of law, N.J.S.A. 2C:29(1)(a) (count six); one count of third-degree possession of a weapon for unlawful purposes, N.J.S.A. 2C:39-4(d) (count nine); and one count of fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count ten).

Pursuant to a negotiated plea agreement, defendant in 2020 pleaded guilty to counts one and seven – the two second-degree aggravated-assault charges. Count one was based on events that took place "[o]n or about the 21st day of March, 2019." Count seven was based on events that took place "on or about

diverse dates between January 2019 and March, 2019." During the plea hearing, defendant confirmed his understanding of the plea agreement and that by pleading guilty he was relinquishing certain rights. He also confirmed he understood that in accordance with the plea agreement, the State would recommend a sentence of two consecutive five-year terms of imprisonment, subject to NERA, but the charges had a possible maximum ten-year term of imprisonment for each count.

At the plea hearing, defendant testified about the factual bases of the aggravated-assault charges to which he was pleading guilty. As to count one, he admitted that between the evening of March 20 and the morning of March 21, 2019, he intentionally pushed Johnny, causing him to fall and hit his head and incur "significant and serious" injury. Defendant acknowledged Johnny had required surgeries on his brain and skull following that incident, continued to suffer from the effects of that physical abuse, and endured potentially permanent disfigurement.

As to count seven, defendant admitted that in January 2019, he had intentionally punched Johnny repeatedly in his body and face, causing significant injuries to his body. Defendant confirmed the indictment had charged him with assaulting and causing injury to his son on "diverse dates" that

4                                                                                      A-1985-20

were "between January 1st and March 1st of 2019" and admitted that he had on repeated occasions attempted to cause or caused serious bodily injury to his son, resulting in Johnny's body being covered in bruises and abrasions. Defendant specifically admitted to an incident in which he had harmed his son when he put his hand around his son's chin and neck and "yank[ed] it." Defendant also acknowledged he had photographed and video-recorded his abuse of his son. The judge accepted defendant's guilty pleas.

Three months later, the court held a sentencing hearing. In his argument, defense counsel stated defendant had two children from his first marriage, including the victim, who lived overseas with their mother after she and defendant divorced. According to counsel, defendant remarried, had two children with his new wife, and brought the children from his first marriage to the United States "to try to give them a new life." He characterized the victim as not "adapting to the lifestyle . . . not learning English." According to counsel, when "[t]he child was being a child," defendant "overreacted and began abusing" him. Counsel referenced "documented videos, which the State is going to play for [the court]," and asserted the purpose of the videos was to show the mother the victim was "not behaving" and that she should take him back. Counsel contended defendant had "snapped" and acknowledged he had "hurt the child

and he almost killed him." Counsel also referenced photographs that showed defendant as a "loving father" and the victim as "well-fed, well-dressed, well-taken care of."

Defendant's counsel argued mitigating factors eight, nine, and twelve, under N.J.S.A. 2C:44-1(b) applied. He asserted mitigating factor eight – "defendant's conduct was the result of circumstances unlikely to recur," N.J.S.A. 2C:44-1(b)(8) – applied because defendant had "lost custody" of all of his children and would not likely abuse other children because he "was picking on this particular child because the child was acting out." He contended mitigating factor nine – "[t]he character and attitude of the defendant indicate that the defendant is unlikely to commit another offense," N.J.S.A. 2C:44-1(b)(9) – applied because defendant had taken responsibility for his actions and expressed "remorse[ and] concern for the welfare [of Johnny]." He argued mitigating factor twelve – "[t]he willingness of the defendant to cooperate with law enforcement authorities," N.J.S.A. 2C:44-1(b)(12) – "partial[ly]" applied because defendant "was very compliant" with law enforcement and because he had attempted to give the child medical attention and had carried him to the ambulance. Counsel again referenced the videos, stating "I believe he was fine

6

if we play some videos, Judge, that are somewhat disturbing, but they only say one side of the story."

Contrary to the State's recommendation, defense counsel asked the court to sentence defendant to concurrent not consecutive terms, contending "[t]his is someone who has already lost a lot. He's continuing to lose. The family is losing. It's going to be an excessive hardship on everyone here. I think the appropriate remedy here is for [the sentences] to be run concurrent, rather than consecutive." The court asked counsel to address how the court could sentence defendant to concurrent sentences in light of <u>Yarbough</u>, 100 N.J. 627, and counsel replied: defendant "voluntarily pled guilty here. The court, certainly, in its discretion may do so. Obviously, the State filed a memo opposing that. The court in its discretion can ultimately do so. That's my understanding."

Defendant gave a statement, relaying his efforts to bring his children to the United States and describing the victim as "refus[ing] to go to school" and "refus[ing] to live as a normal kid." He characterized his abuse of his son as "one freak accident, mistake," saying to the court: "If you would . . . look at my history and look at the photos, we had a great time as a family. All of us together. It was just this one situation that just got out of control, and I just didn't know how to handle it."

The assistant prosecutor asked the court to find aggravating factors three and nine under N.J.S.A. 2C:44-1(a), to find no mitigating factors under N.J.S.A. 2C:44-1(b), and to sentence defendant in accordance with the plea agreement: two consecutive five-year terms of imprisonment, subject to NERA. Pointing out defendant had pleaded guilty to "two separate aggravated assaults months apart that resulted in serious bodily injury to this child," she argued aggravating factor three – "[t]he risk that the defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3) – applied because, "as [the court would] see with the photos and the videos, it wasn't even just two incidents. This was daily torture of this child. . . . [I]f he could do this to one child . . . he has a risk of reoffending in the future." She contended aggravating factor nine – "[t]he need for deterring the defendant and others from violating the law," N.J.S.A. 2C:44-1(a)(9) – applied to defendant because of the general need to deter and "the need to deter this defendant from ever even thinking about harming another child."

Acknowledging the photographs defendant had provided to the court of "a happy, health[y], eleven-year-old boy," the assistant prosecutor described the victim's condition the day after defendant had pushed him: he had "lost 75 percent of his blood," "had a skull fracture," and "was covered in whip marks and what appeared to be healing burns, scars, literally from head to toe. Behind

8

his ears. Everywhere. He had brain bleeds." Just as defense counsel had told the court defendant had "almost killed him," the assistant prosecutor stated, "honestly, Judge, this was almost a homicide. No one anticipated that this child would live."

The assistant prosecutor introduced four photographs from defendant's phone taken of Johnny in the hospital after defendant had pushed him. Those photographs depicted Johnny comatose on a ventilator, with his head having over twenty sutures and covered in bandages following emergency brain surgery, scarring on his neck, and cuts and bruises on his face.

The assistant prosecutor indicated she was going to show the court additional photographs and videos taken on different dates. Defense counsel objected, arguing the showing of those photographs and videos was "redundant," "excessive," "unduly prejudic[ial]," and beyond the crimes to which defendant had pleaded guilty. The assistant prosecutor contended the photographs were relevant to defendant's assertion he would not commit these crimes again and that the court was allowed "to consider all the facts and circumstances of a case, not just the charge that the [d]efendant pleads guilty to." The court advised counsel it would "reject[] any speculation" and "take in what [it] think[s] is appropriate."

9

The assistant prosecutor presented five photographs from defendant's phone taken before the pushing incident, showing Johnny with wounds and bruises on his body. Defense counsel objected, contending the photographs did not depict actions related to the two counts to which defendant had pleaded guilty or injuries proved to have been caused by defendant. He then asserted the victim's sister had physically abused him. The court stated it understood the State was submitting the photographs in rebuttal to defendant's assertion "that this was a one-time freak accident and he accepted responsibility and he was remorseful that this was a one-time freak accident" and his arguments in support of the mitigating factors he was requesting the court to consider. The court concluded "the rules of evidence in terms of the sentencing would be a bit relaxed seeing that [the photographs] come from [defendant's] phone."

Finally, the assistant prosecutor submitted five videos depicting abuse of Johnny, including a video of the yanking incident. Defense counsel objected to the introduction of the videos, which, according to the assistant prosecutor, defendant had admitted taking and had been turned over in discovery. The court stated it was not accepting the assistant prosecutor's commentary about the videos and if it considered any of the videos, it would limit its consideration to "the purposes of rebuttal," specifically, "the limited purpose of . . . the attempt

to reject the defense's position that this is a one-time only freak accident." The court expressly stated it would not consider the videos "towards any additional crime, . . . [b]ut in terms of the remorsefulness that [the court] heard from the defendant."

The court asked counsel again to address Yarbough, 100 N.J. 627. The assistant prosecutor argued for consecutive sentences, contending "[t]hese were two specific separate incidents" and referencing one incident that "involved a push" and one that involved "the snap of the neck." In response, defense counsel did not challenge that description of the incidents at issue. He conceded defendant had "inflicted two separate assaults" but questioned if those assaults had caused two separate injuries: "We know that he inflicted two separate assaults. We don't know if it necessarily resulted in a visible injury. We know the one was disastrous." Likening defendant's actions to a "crime spree," defense counsel also argued defendant's abuse of his son was "a continued pattern of behavior . . . directed at the same person over a brief period of time." Before rendering sentence, the court advised counsel it had listened to the Courtsmart recording of the plea hearing and confirmed defendant had admitted to the yanking incident as part of the factual basis of his plea.

In rendering the sentence, the court gave "some weight" to aggravating factor three but not for the reasons argued by the assistant prosecutor because the court believed accepting that argument could constitute "double counting . . . under the Yarbough factors." Instead, the court considered aggravating factor three because it believed defendant had "something deep seated in [him] . . . an emotional issue" that if he did not address through counseling could lead him to commit another offense. Considering aggravating factor nine, the court gave weight to the general need to deter and "strong weight" to the need to deter defendant. The court said to defendant "[y]ou saw the videos. I heard your voice" and questioned how the victim could "ever trust an adult . . . to [put] their arm around them ever again," referencing the yanking incident.

The court gave no weight to mitigating factor eight because even though defendant no longer had contact with the victim, he could harm another child. It gave no weight to mitigating factor nine because it found no factual support for defendant's assertion "this is a one-time freak accident." It gave no weight to mitigating factor twelve because there was evidence defendant had attempted to cover up his crimes.

The court found the aggravating factors outweighed the mitigating factors. Consistent with the terms of the plea agreement, the court sentenced defendant

A-1985-20

to a five-year term of imprisonment, subject to NERA, for each count. The court then considered the Yarbough factors in determining whether the sentences should run concurrently or consecutively to each other.

The court described the two counts to which defendant had pleaded guilty. As to count one, the court found defendant had admitted that "on March 20th or 21st, [he] pushed the victim so hard that he hit his head on the molding. . . . So that's one incident from about March 20th to 21st." As to count seven, the court found defendant had admitted that beginning in January 2019 to March 1, 2019, he "repeatedly punch[ed the victim] in the body and face. Repeatedly over the course of this time intentionally causing significant bodily injury." The court noted defendant also had "[a]dmitted to putting [his] arm around [the victim] on another occasion during this time period. Putting [his] hand on [the victim's] chin, as corroborated in the video, and yanking his neck to cause injury." The court found "there was one set of events from January to about March 1st [(count seven)] and another set of events that took place at about March 20th and 21st [(count one)]." The court had

> [n]o doubt these were two separate sets of incidents. One was the punching to the body and face with the bruises; significant and serious injuries. And the head yanking.

13

And then the second one . . . was the striking of the child so he fell down causing injuries to his head which required the various brain surgeries. So these were separate acts of violence and threat of violence.

Regarding the timing of the "two separate sets of incidents," the court found defendant had "punched [the victim], caused these injuries, [he] stopped, weeks or perhaps a month later [he] then pushed him so hard he had to have brain surgery." The court concluded "the victim here was a victim at least twice" and that defendant had "tortured [his] son twice by pushing him down and causing those brain injuries on count one." As to the events that formed the basis of count seven, the court specifically referenced defendant's admissions to "repeatedly punching" the victim and to yanking his neck.

Reviewing additional Yarbough factors, the court concluded "consecutive sentences [were] appropriate in this case" and sentenced defendant on each count to a five-year term of imprisonment, subject to NERA, to run consecutively "from one to the other." On March 2, 2021, the court entered a judgment of conviction, memorializing defendant's convictions by his guilty pleas and the resulting sentences.

On appeal, defendant challenged the sentences, specifically the court's decision to run them consecutively. Unpersuaded by defendant's arguments, we affirm.

14

II.

Our "standard of review of a sentencing decision is well-established and deferential." State v. Vanderee, 476 N.J. Super. 214, 235 (App. Div. 2023), certif. denied, 255 N.J. 506 (2023). "We 'must not substitute [our] judgment for that of the sentencing court.'" Ibid. (alteration in original) (quoting State v. Liepe, 239 N.J. 359, 370 (2019)). Nevertheless, we are charged with ensuring the trial court's findings and balancing of aggravating and mitigating factors are supported by adequate evidence in the record and that the sentence imposed is neither inconsistent with the sentencing provisions of the Code of Criminal Justice nor shocking to the judicial conscience. See ibid.; see also State v. Rivera, 249 N.J. 285, 297-98 (2021). We presume "[a] sentence imposed pursuant to a plea agreement" is "reasonable because a defendant voluntarily '[waived] . . . his right to a trial in return for the reduction or dismissal of certain charges, recommendations as to sentence and the like.'" State v. Fuentes, 217 N.J. 57, 70-71 (2014) (quoting State v. Davis, 175 N.J. Super. 130, 140 (App. Div. 1980)); see also State v. Bell, 250 N.J. 519, 542 (2022). "[A] sentence recommended as part of a plea agreement, however, may be vacated if it does not comport with the sentencing provisions of our Code of Criminal Justice." Fuentes, 217 N.J. at 71; see also Rivera, 249 N.J. at 298.

15

On appeal, defendant first argues the court abused its discretion by allowing the State to submit photographs and videos of defendant's abuse of his son for the court's consideration before it sentenced defendant, contending those items were not authenticated, were inflammatory, were "not all specific to the dates that the defendant plead[ed] to," and improperly influenced the court. We are not persuaded by that argument.

In <u>Fuentes</u>, our Court described what a trial court may consider in sentencing a defendant who has pleaded guilty to a crime:

> [T]he Code, our case law and the court rules prescribe a careful and deliberate analysis before a sentence is imposed. The foundation of that analysis is a thorough understanding of the defendant and the offense. Although a court sentencing a defendant based upon a guilty plea must be careful not to impose a sentence for an offense beyond the scope of the plea, it is not limited only to the factual admissions that comprise the basis for the plea. [State v.] <u>Sainz</u>, . . . 107 N.J. [283,] . . . 293 [(1987)]. Instead, "[a]t sentencing there should be presented 'the fullest information possible concerning the defendant's life and characteristics.'" <u>State v. Marzolf</u>, 79 N.J. 167, 176 (1979) (quoting <u>Williams v. New York</u>, 337 U.S. 241, 247 (1949)); <u>accord</u> [State v.] <u>Natale</u>, . . . 184 N.J. [458,] . . . 472 [(2005)]. The court evaluates "a range of information unconstrained by evidential considerations." <u>State v. Randolph</u>, 210 N.J. 330, 348 (2012) (citing <u>Natale</u>, <u>supra</u>, 184 N.J. at 486). Thus, the sentencing court gathers information necessary to assess the defendant's history and characteristics, and to understand the nature and circumstances of his or her crime.

16

[Id. at 71-72 (fifth alteration in original).]

In Sainz, the Court held:

> When a trial court imposes a sentence based on defendant's guilty plea, the defendant's admissions or factual version need not be the sole source of information for the court's sentencing decision. We have stated before that the court may look to other evidence in the record when making such determinations, that it should consider "the whole person," and all the circumstances surrounding the commission of the crime. . . . What is important—when the court goes beyond defendant's admission or factual version—is that the court not sentence defendant for a crime that is not fairly embraced by the guilty plea.
>
> [107 N.J. at 293.]

See also State v. Kiriakakis, 235 N.J. 420, 437 (2018) ("The whole person concept authorizes the sentencing court to comprehend in its deliberations a wide range of information that might otherwise be excluded by evidentiary norms." (quoting State v. Humphreys, 89 N.J. 4, 14 (1982))); N.J.R.E. 101(a)(3)(C) (permitting the relaxation of the rules of evidence "to admit relevant and trustworthy evidence" in sentencing proceedings).

We aren't convinced the photographs and videos presented by the State at the sentencing hearing depicted events that were not encompassed by defendant's guilty pleas. Some of the photographs clearly depicted Johnny's condition after, and the injuries he had suffered as a result of, the pushing

incident to which defendant pleaded guilty under count one. During the plea hearing, defendant admitted to pushing his son, causing him to fall and hit is head, and acknowledged Johnny had required surgeries on his brain and skull following that incident.

Other photographs showed Johnny having bruises and other injuries. The videos depicted Johnny being physically abused, including in the neck-yanking incident. Pursuant to the language of count seven, by pleading guilty to that count, defendant admitted he "on or about diverse dates between January 2019 and March, 2019," had attempted to cause or caused "serious bodily injury" to Johnny. During the plea hearing, as to count seven, defendant again admitted he repeatedly had caused or attempted to cause Johnny serious bodily injury on multiple occasions during that time period, resulting in his body being covered in bruises and abrasions. He admitted to occasions when he repeatedly punched Johnny in the body and face and admitted to the neck-yanking incident. And given defendant's admission he had photographed and video-recorded his abuse of his son, we are not persuaded by defendant's lack-of-authentication argument.

Moreover, the court was not limited to considering only defendant's factual admissions that comprised the bases for his pleas. See Fuentes, 217 N.J. at 71; Sainz, 107 N.J. at 293. Even if some of the events shown in the

photographs or videos were not encompassed by defendant's guilty pleas, we are convinced the court carefully and appropriately limited its consideration of the State's submissions. The court expressly stated it was not considering the assistant prosecutor's commentary or any speculation, was reviewing the submissions only for "rebuttal" purposes, and was not viewing the submissions as evidence of additional crimes. And the only submissions the court specifically referenced in rendering its decision was the video of the yanking incident, which was one of the factual bases of defendant's guilty plea to count seven, and the photographs of his son in the hospital after the brain surgery he had following the pushing incident that was the factual basis of defendant's guilty plea to count one.

Defendant focuses his argument that the court was improperly influenced by the State's submissions on the neck-yanking video, even though that video showed conduct defendant had expressly admitted. Contrary to defendant's assertions, we see no basis to conclude that video or any of the other submissions led the court to "double count[] multiple aggravating factors" or err in finding there was a risk defendant would reoffend. In fact, the court rejected as improper double counting the State's contention the court should apply aggravating factor three because the multiple instances of abuse demonstrated defendant had a risk

19

of reoffending. Finding aggravating factor three applied for a different reason, the court thoughtfully explained why it believed defendant, if he did not seek appropriate counseling, had a risk of committing another offense.

Most important, the court did not sentence defendant for a crime that was "not fairly embraced" by his guilty pleas. Sainz, 107 N.J. at 293. The court sentenced defendant for the crimes charged in the two counts to which he had pleaded guilty. Nothing in the court's decision was inconsistent with the factual bases of defendant's guilty pleas.

In his second argument on appeal, defendant contends the State's submissions caused the court to misapply the Yarbough factors. The court did not misapply those factors.

When a defendant is subject to multiple sentences for more than one offense, the Code of Criminal Justice gives the trial court discretion to decide whether those sentences should run concurrently or consecutively. N.J.S.A. 2C:44-5(a); see also Vanderee, 476 N.J. Super. at 238; State v. Miller, 205 N.J. 109, 128 (2011). "'[W]hen determining whether consecutive sentences are warranted,' a court is required 'to perform the well-known assessment of specific criteria' commonly referred to as the Yarbough factors." Vanderee, 476 N.J. Super. at 238 (quoting Randolph, 210 N.J. at 353). Those factors include:

(1)    there can be no free crimes in a system for which the punishment shall fit the crime;

(2)    the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;

(3)    some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

>    (a)    the crimes and their objectives were predominantly independent of each other;
>
>    (b)    the crimes involved separate acts of violence or threats of violence;
>
>    (c)    the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
>    (d)    any of the crimes involved multiple victims;
>
>    (e)    the convictions for which the sentences are to be imposed are numerous;

(4)    there should be no double counting of aggravating factors; [and]

(5)    successive terms for the same offense should not ordinarily be equal to the punishment for the first offense. . . .

A-1985-20

[Ibid. (quoting Torres, 246 N.J. at 264).][2]

"The Yarbough factors are qualitative, not quantitative; applying them involves more than merely counting the factors favoring each alternative outcome." State v. Cuff, 239 N.J. 321, 348 (2019). The sentencing court "must explain its decision to impose concurrent or consecutive sentences" because "[a] statement of reasons is a necessary prerequisite for adequate appellate review of sentencing decisions." Ibid. (alteration in original) (quoting State v. Miller, 108 N.J. 112, 122 (1987)).

Defendant faults the court for not following the Yarbough factors and for imposing consecutive sentences when, according to defendant, he had engaged in what "could . . . be viewed as one overall act of aberrant behavior" and "had in essence pled to two identical offenses." But the court thoroughly and appropriately reviewed the Yarbough factors; the record supported the court's conclusion "the crimes involved separate acts of violence," Yarbough, 100 N.J. at 644; and defendant had not pleaded guilty to identical offenses.

As the court found, "just because there is one victim," sentences are "not automatically consecutive, not automatically concurrent. You've got to look at

---

[2] A sixth factor was eliminated by statute. Liepe, 239 N.J. at 372 n.4; see also N.J.S.A. 2C:44-5(a).

the facts of it." The court concluded, as supported by the record and defendant's admissions, "there was one set of events from January to about March 1st" in which defendant caused injuries to the victim's face and body from repeated beatings. Nearly three weeks passed with no assaultive conduct by defendant. Then, "another set of events . . . took place at about March 20th and 21st" in which defendant pushed the victim, causing him to fall and sustain injuries that required brain surgery. The court reasonably concluded those "were separate acts of violence" and that simply because he had repeatedly assaulted his son in January and February, defendant was not entitled to "a free crime [of] pushing him down so hard to cause brain injuries." The court accordingly sentenced defendant to consecutive sentences.

We see no abuse of discretion or error in that determination. Although the sentencing hearing pre-dated the Court's opinion in Torres, the court's opinion and comments during the colloquy with counsel made clear the court weighed the overall fairness of the sentence in determining to impose consecutive sentences at the bottom of the range in accordance with defendant's negotiated plea agreement. 246 N.J. at 270.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1985-20